# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:23-CR-130 (SVN) |
| | ) | |
| v. | ) | |
| | ) | |
| GUY EUGENE, | ) | |
| *Defendant*. | ) | April 10, 2025 |

## RULING ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Sarala V. Nagala, United States District Judge.

On September 26, 2022, a Victim ("V-1") reported that he was assaulted, kidnapped at gunpoint, and robbed by four suspects in Bridgeport, Connecticut. At a subsequent photo array presented by police, V-1 identified Defendant Guy Eugene as one of the suspects. Defendant Eugene has been charged with interference with commerce by robbery, kidnapping, and carrying, using, and brandishing a firearm during and in relation to a crime of violence. He has moved to suppress the photo array and any in-court identification of him by V-1, on the basis that the photo array was unduly suggestive and that any in-court identification would not have any reliable origin independent of the tainted pretrial identification. Eugene also challenges certain federal and state search warrant affidavits on various grounds and moves to suppress the fruits of searches that relied on those warrants. For the reasons described below, the motion to suppress is GRANTED as to the inadmissibility of the photo array at trial, but DENIED in all other respects, including as to any potential in-court identification by V-1.

I.      **FACTUAL BACKGROUND**

A. <u>September 26, 2022</u>[1]

On the morning of September 26, 2022, Bridgeport Police responded to a report of shots fired near the Island Vybez restaurant in Bridgeport.  September 26, 2022, Incident Report, ECF No. 54-3 at 3.  Individuals reported that V-1 was kidnapped outside of the restaurant.  *Id.*  Police later located V-1 at a location on the West Side of Bridgeport, and V-1 subsequently recounted that day's events to the reporting officer.  *Id.* at 4.

V-1 reported that he had pulled into the parking lot of his restaurant with cash to pay the restaurant's rent.  *Id.* at 5.  V-1 noticed a friend in the parking lot and approached him to have a conversation.  *Id.*  Shortly afterwards, a gray Infiniti pulled up behind V-1's parked vehicle.  *Id.* A tall Black male ("the Suspect")[2] exited the "left rear passenger side"[3] of the vehicle carrying a firearm and approached V-1, demanding that he get inside the Infiniti.  *Id.*  After V-1 refused, the Suspect struck V-1 in the head with the firearm.  *Id.*  V-1 began physically fighting the Suspect, at which point another Black male exited the right rear passenger side of the Infiniti.  *Id.*  This second suspect punched V-1 in the face and ribs.  *Id.*  Afraid that he might be killed, V-1 stopped fighting; the individuals then placed V-1 inside of the Infiniti, while pushing V-1's head towards the floor to prevent him from seeing their faces and the location to which the vehicle was headed.  *Id.*  While the vehicle drove away from the restaurant, V-1's friend began shooting at the Infiniti in an attempt to stop it.  *Id.*  V-1's friend followed the Infiniti for some time, causing the driver of the Infiniti to drive faster and more recklessly.  *Id.* at 5–6.

---

[1] The following section is taken from the Bridgeport Police Incident Report dated September 26, 2022.  ECF No. 54-3.

[2] The Court refers to "the Suspect" as the person who exited the Infiniti first to approach V-1 and later sat to the left of V-1 in the back seat of the Infiniti.

[3] The Court believes, from later interviews of V-1, that the "left rear passenger side" refers to the rear *driver's* side of the Infiniti.

The driver of the Infiniti eventually took off his ski mask and stated, "I want to get out, I'm getting out." *Id.* at 6.  The suspect seated in the right rear passenger side then stated about V-1,"[w]e should kill him, he's a waster of time and does not have anything." *Id.*  As the Infiniti continued to drive around Bridgeport, the Suspect in the left rear seat, who had made a comment about going to V-1's residence, placed a firearm to V-1's head and said, "[d]on't lift your head." *Id.*  V-1 was nonetheless able to observe the streets and neighborhoods through which the Infiniti travelled. *Id.*

V-1 reported that he heard a suspect call a party on the phone by the name "Fresh." *Id.* After that suspect realized he used this name, V-1 observed that suspect appeared nervous. *Id.* Eventually, the suspects dropped V-1 off at a garage in another area of Bridgeport. *Id.*  V-1 reported that his phone, gold earrings, key to his vehicle, and approximately $3,100 in cash were stolen from him. *Id.*

V-1 reported that there were four suspects in the Infiniti. *Id.* at 7.  All were Black men wearing all black clothing and ski masks and all suspects had firearms. *Id.*  He specifically described that the person seated in the left rear seat, the Suspect, was a Black male, approximately 6'2" tall, muscular, with a black beard and see-through glasses. *Id.*

B.  <u>September 28, 2022, Photo Array</u>[4]

Two days after this incident, on September 28, 2022, V-1 met with Bridgeport Police for a recorded interview to discuss the events of September 26, 2022.  V-1 recounted the same general course of events as he had recounted to police on the day of the incident.

V-1 again described that a grey Infiniti pulled into the restaurant parking lot, although V-1 added specific descriptions of damage to the bumper, identified the model of the car, and

---

[4] The following section is taken from documentation of the September 28, 2022, photo array, ECF No. 82-3, and from a video recording of the same array and the interview that preceded it, ECF No. 82-4, beginning at 12:11.

indicated which windows were tinted and by how much. Video of September 28, 2022, Interview and Photo Array, ECF No. 82-4 at 12:24, 12:42. V-1 again described that the Suspect exited from the driver's side rear door while wearing a ski mask and carrying a gun, that V-1 began resisting him, and that another man then exited from the rear door of the other side to confront V-1. *Id.* at 12:16, 12:42. V-1 also represented that he was hit in the face with a gun and began bleeding during this initial encounter. *Id.* at 12:43.

V-1 further reported that at some point after the Infiniti left the restaurant parking lot, the suspect in the front passenger seat exited the vehicle, saying, "I didn't sign up for this." *Id.* at 12:44. V-1 reported that, when he was in the back seat of the Infiniti, at one point, one suspect held him by the neck and the other held him by the foot. *Id.* When asked by an officer if he could see the road he said, "no, not really," and described how when he would attempt to look up, the suspects would force his head back down or put V-1's shirt over his head. *Id.* V-1 was still able, however, to provide many details about the streets the Infiniti passed through and which turns the vehicle took. *See*, *e.g. id.* at 12:18, 12:43.

V-1 described that the Suspect, who had initially tried to pull him into the car, was wearing red Cartier glasses. *Id.* at 12:21. V-1 believes the Suspect owned the car, as he was complaining about needing to get the car fixed during the drive. *Id.* V-1 described the Suspect as having a beard, a bald head, being muscular, being 6 feet or more in height, and having dark skin. *Id.* at 12:25–26. V-1 also described a physical struggle with the Suspect, during which V-1 pulled off the Suspect's ski mask. *Id.* at 12:49. V-1 reported that he saw the Suspect's face and observed

the Suspect wearing red Cartier glasses.[5]  About this man, V-1 told police, "[i]f I see the guy, I could know him, because I was looking dead in his face."  *Id.* at 12:27.

V-1 again represented that he heard someone referred to as "Fresh."  *Id.* at 12:21.  At one point in the interview V-1 indicated that he was unsure if the name "Fresh" was used in reference to a suspect in the back seat or to someone on the phone, *id.* at 12:21, but at another point, V-1 indicated that he understood "Fresh" to be in the back seat.  *Id.* at 12:25, 12:47–48.

As part of the September 28, 2022, interview, an officer unaffiliated with the investigation showed V-1 a sequential photo array of eight individuals that did not include a photo of Defendant Eugene.  V-1 did not identify any of the individuals in the photo array as a suspect.

    C.   <u>October 14, 2022, Photo Array</u>[6]

On October 14, 2022, V-1 met with police to participate in another interview and photo array.  V-1 again recalled that the Suspect who was seated to his left in the Infiniti had a beard and bald head.

V-1 was again presented with a sequentially ordered photo array of eight individuals by an officer not involved in the case.  Before the array, V-1 was provided certain instructions.  *See* October 14, 2022, Photo Array, ECF No. 54-4 at 2–3.  The instructions included the following line:  "The persons in the photographic lineup . . .  may not look exactly as they did on the date of the offense because features like facial or head hair can change."  *Id.*  They also stated that if V-1 selected a person or photograph, he would "be asked to provide a statement about this process and the results."  *Id.* at 3.

---

[5] In one portion of the interview, V-1 indicated he was talking about the man beside him, as he gestured to his left, and then proceeded to describe an incident in which he wrestled with that man, pulled at his ski mask, and saw his face and Cartier glasses.  ECF No. 82-4 at 12:49.

[6] The following section is taken from documentation of the October 14, 2022, photo array, ECF No. 54-4, and from a video recording of the same array and the brief interview that preceded it, ECF No. 54-5.

After studying the photo of Defendant Eugene for a few moments, V-1 stated, "[t]his guy kind of looks like one of them.  With a beard. . . . I think this guy looks like one of them.  He's very tall."  Video of October 14, 2022, Interview and Photo Array, ECF No. 54-5 at 13:28.  Then he said the photo "looks like the guy that pulled me into the car.  I just remember he's got a beard and a bald headed.  I know he's very masculine."  *Id.* at 13:29.

When the detective administering the array directed V-1 to "write on the back what it's in relation to," *id.* at 13:32, V-1 wrote, "[t]his person has beard and bald head as 1 of the guys from the incident.  He was very masculine like he works out.  He's taller than me, I am 5'9" and he was wearing a glasses the frames was red."  ECF No. 54-4 at 14.

D.  V-1's *Wade* Hearing Testimony

As described below, the Court granted Defendant Eugene's request for a hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to evaluate the suggestiveness of the identification procedures and whether a potential in-court identification by V-1 would be independently reliable, despite any allegedly suggestive photo array procedure.  The following section is taken from V-1's *Wade* hearing testimony.  *See* Tr., ECF No. 125.

V-1's *Wade* hearing testimony again covered the same general course of events as covered by his previous interviews.  In relevant part, notably, V-1 clearly identified that the first individual who exited the Infiniti, from the driver's side rear door, was the same individual as the one who sat to his left in the rear seat (the Suspect).  *Id.* at 31, 35.  V-1 identified this man as wearing a black hoodie, black ski mask, black gloves, and red Cartier glasses with see-through lenses, *id.* at 31; as having dark skin, a thick beard, a bald head, and a masculine build, *id.* at 32; and as being over six feet tall, *id*.  V-1 testified that he thought this individual perhaps owned the Infiniti, because he was talking about needing to get it fixed.  *Id.* at 43.

V-1 described two different opportunities to view the Suspect's face. First, after the Suspect initially exited the Infiniti in the restaurant's parking lot, V-1 initiated a physical altercation that he described as "tussling." *Id.* at 33. At this point, V-1 pulled the Suspect's mask off halfway up the Suspect's head. *Id.* V-1 testified that he could see the Suspect's face for a few moments from the glasses down before the Suspect pulled his mask back down. *Id.*

Second, in the car, when V-1 was sitting "shoulder-to-shoulder" with the two suspects in the back seat, *id.* at 36, V-1 described a physical altercation in which he pulled off the Suspect's ski mask, causing the Suspect's glasses to fall off so that V-1 "could see his face fully," *id.* at 41. While the mask never completely cleared the top of the Suspect's head, V-1 nonetheless testified that, based on the contours of the ski mask, he could see there was not any hair underneath it. *Id.* at 74.

When asked about how he felt about his ability to identify the Suspect again, V-1 testified, "[i]f I see him, I could identify him, yes." *Id.* at 81.

## II. PROCEDURAL HISTORY

Eugene is charged with three counts: interference with commerce by robbery, in violation of 18 U.S.C. § 1951(a); kidnapping, in violation of 18 U.S.C. § 1201(a)(1); and carrying, using, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Superseding Indictment, ECF No. 56.

Eugene moved to suppress V-1's out-of-court identification of him through the October 14, 2022, photo array and any later in-court identification of him by V-1, on the grounds that the photo array was unduly suggestive and that V-1's identifications would not have any reliable origin independent of the allegedly tainted procedure. Mot. to Suppress, ECF No. 52. As part of his motion, Eugene requested that the Court hold a *Wade* evidentiary hearing, to evaluate the

suggestiveness of the photo array identification procedures and to determine whether there are any indicia of reliability to support V-1's identification. Eugene's motion also challenged certain federal and state search warrant affidavits on various grounds, and he moved to suppress the fruits of searches that relied on those warrants. Regarding the warrants, Eugene requested that the Court hold a pretrial evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). The Government opposed the motion to suppress in full and contended that neither a *Wade* nor a *Franks* hearing was necessary. Gov't Opp. Br., ECF No. 66. On October 21, 2024, notwithstanding the Government's objection, the Court granted Eugene's request to hold a hearing under both *Wade* and *Franks*. Order, ECF No. 72.

Ten days later, the Government, through new counsel, filed a notice in which it represented that, if the Court were to find that the photo array was unduly suggestive, the Government would not offer V-1's out-of-court identification at trial, though it would still intend to offer V-1's in-court identification in its case-in-chief. Gov't Not., ECF No. 80. In addition, the Government conceded it would not offer as evidence the fruits of the challenged federal warrants, and that it would seek a new federal warrant for cell-site data, in lieu of relying on the state search warrant for cell-site data that Eugene was challenging. *Id.* at 3–4. The Court proceeded to order supplemental briefing regarding the witnesses at the *Wade*/*Franks* hearing and the scope of their testimony. Order, ECF No. 86.

On November 26, 2024, the Government filed a motion for reconsideration regarding the Court's order to hold a *Wade* and *Franks* hearing. Mot. for Recons., ECF No. 93. The Court granted the motion for reconsideration as to the *Franks* hearing, but denied it as to the *Wade* hearing. Order, ECF No. 100. On February 12, 2025, the Court held a *Wade* hearing at which V-1 testified. *See* ECF No. 125. At the *Wade* hearing, the Government requested that the hearing

not go forward unless the Court found that the October 14, 2022, photo array was unduly suggestive. The Court issued an oral ruling in which it made such a finding. ECF No. 125 at 4–10. Following the *Wade* hearing, both parties submitted post-hearing briefing.

### III.    DISCUSSION

Eugene's motion to suppress is no longer live as to the fruits of the challenged search warrants and is therefore denied in that respect. *See* ECF No. 100. But it remains live as to whether the October 14, 2022, photo array and V-1's potential in-court identification of Eugene are admissible.

When a defendant objects to identification testimony to be offered by a witness who identified the defendant at a photo array before trial, the Court must assess whether the photographic identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). To make this determination, the Court engages in a sequential inquiry to determine the admissibility of the identification. *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). First, the Court must determine whether the identification procedures were unduly suggestive. *Id.* at 133–34. If a pretrial identification process was unduly suggestive, the Court then proceeds to a second step, inquiring whether a witness's in-court identification is nonetheless independently reliable, "rather than the product of the earlier suggestive procedures." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990); *Raheem*, 257 F.3d at 133, 135. "In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." *Raheem*, 257 F.3d at 133.

For the reasons described below, the Court finds, as explained from the bench at the *Wade* hearing, that the October 14, 2022, photo array was unduly suggestive. Based on the

Government's concession that it would not use the photo array at trial if the Court found it was unduly suggestive, Eugene's motion to suppress is granted as to admission of the October 14, 2022, photo array at trial.[7]    The Court further finds, however, that any potential in-court identification by V-1 has sufficient indicia of independent reliability, such that Defendant Eugene's motion to suppress the potential in-court identification must be denied.

### A.    Suggestiveness of the October 14, 2022, Photo Array

A pretrial identification procedure "is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem*, 257 F.3d at 134 (collecting cases).  In other words, a photo array is unduly suggestive if it is "so limited that the defendant is the only one to match the witness's description of the perpetrator." *Maldonado-Rivera*, 922 F.2d at 974 ; *see also Raheem*, 257 F.3d at 134 ("Where one witness has emphasized a particular characteristic of the perpetrator in giving a description to the police, a lineup in which only the defendant has that characteristic may well taint the identification of the defendant only by that viewer.").

The key inquiry, then, is the extent to which a photo array depicts aspects of a witness's pre-array description in the photograph of the defendant, but does not depict those aspects in the photos of the other individuals in the array.  "If there is nothing inherently prejudicial about the

---

[7] In its post-hearing briefing, the Government appears to reverse its previous position as to whether it seeks to admit the pre-trial photo array. *Compare* ECF No. 80 at 2 ("[I]f the Court does find that the photo array was unnecessarily suggestive, the Government will not offer the victim's out-of-court identification of the defendant during its case-in-chief at trial . . . .") *with* Gov't Suppl. Br., ECF No. 136 at 3, n.1 ("We believe the law supports admission of both the victim's in-court and out-of-court identification, even with the Court's finding that the photo array shown to V-1 was suggestive.").  The Government suggests that it only conceded it would not seek to admit the array if the Court found the array unduly suggestive "[i]n an effort to obviate the need for a hearing."  ECF No. 136 at 3, n.1.  As the Government previously took the position that it would not seek to admit the array if the Court found it unduly suggestive, it would not be fair to allow the Government to now backtrack and seek admission of the array itself.  The Court therefore holds that the photo array may not be admitted at trial, based on its holding that the array was unduly suggestive and of the Government's earlier concession that it would not seek to admit the array if the Court found as much. *See* ECF No. 80 at 2.

presentation, such as use of a very small number of photographs or of suggestive comments, the 'principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Maldonado-Rivera*, 922 F.2d at 974 (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)).  Arrays in which suspects are "the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." *Raheem*, 257 F.3d at 134.

Here, V-1 had described the Suspect's appearance to police before the October 14, 2022, photo array.  The incident report from September 26, 2022, represents that V-1 described the Suspect who sat in the left rear passenger seat of the Infiniti as a Black male being approximately 6'2", having a muscular build, wearing a black ski mask, all black clothing, see-through glasses and as having a black beard.  *See* ECF No. 54-3 at 7.  During the September 28, 2022, interview with police and the subsequent photo array, V-1 likewise identified the Suspect as being over six feet tall, dark skinned, muscular, and as being bearded and bald.  *See* ECF No. 82-4 at 12:26. Finally, during the October 14, 2022, photo array, in the process of identifying Eugene, V-1 again recalled the Suspect having a beard and bald head.  *See* ECF No. 54-5 at 13:28–29.

The October 14, 2022, photo array consisted of photographs of eight men.  All men appear to be roughly the same age, all appear to be Black, and all are wearing glasses.  ECF No. 54-4.  All men are depicted in roughly the same way in that their faces have been photographed from approximately the same distance and their faces take up approximately the same portion of the photograph presented.

But, notably, Eugene is the only individual depicted with a fully bald head and a full beard. *See id.* at 6. As for the facial hair depicted in the photographs, the man in photograph 4 appears completely clean shaven and without facial hair. The men in photographs 1, 2, 3, 5, and 6 have facial hair of varying degrees, but to the extent they do have facial hair, it is less thick than Eugene's and noticeably shorter in length. The facial hair of the man depicted in photograph 8 is substantially obscured because of the lack of lighting in that photograph, but it appears he may have a goatee and possibly a short mustache. Eugene's facial hair, on the other hand, is depicted as thick in concentration, full in terms of face coverage, and not short in length.

As for the baldness of the other men, all other men, except for Eugene and the man depicted in photograph 8, clearly have hair to some degree. The men in photographs 1 through 6 vary in whether each is balding and where exactly their hairlines begin, but each visibly has *some* hair. The man in photograph 8 is depicted in such dark lighting that the Court cannot determine for certain whether he is depicted with hair, although the contours in shadow lines and faint details hint that he might. Eugene is the only person in the array depicted as being completely bald. Moreover, the Court notes that the Line-up Key produced by the Bridgeport Police, which describes the hair color of all eight men from the photo array, identifies all of the individuals except Eugene as having "Black" hair, while only Eugene is described as having a hair type of "None (Bald)." *See id.* at 5.[8]

In sum, Eugene is the only individual depicted in the photo array who is *fully* bald and who has a *full* beard. Thus, his is the only photo that depicts the combination of the two major facial features V-1 had identified in his interviews with police. Given that V-1 had identified the Suspect as being bald and having a beard, and that Eugene's was the only such photo in the array, the

---

[8] While the Government notes that the Line-up Key was not shown to V-1 during administration of the array, *see* ECF No. 136 at 2, it is nonetheless probative of whether Eugene is, in fact, the only bald man in the array.

October 14, 2022, photo array was unduly suggestive.  *See Maldonado-Rivera*, 922 F.2d at 974; *Raheem*, 257 F.3d at 134.

V-1's remarks during the photo array, and his remarks after selecting Eugene's photo, lend further support to the finding that the array was unduly suggestive.  V-1 appeared to choose Eugene's photo precisely *because* it was the only one depicting a bald, bearded man.  After studying the photo of Eugene for a period of time, V-1 stated, "[t]his guy kind of looks like one of them.  With a beard. . . . I think this guy looks like one of them.  He's very tall."  ECF No. 54-5 at 13:28.  V-1 then said the photo "looks like the guy that pulled me into the car.  I just remember he's got a beard and a bald headed.  I know he's very masculine."  *Id.* at 13:29.  When the detective administering the array directed V-1 to "write on the back what it's in relation to," *id.* at 13:32, V-1 wrote:  "*[t]his person has beard and bald head as 1 of the guys from the incident*.  He was very masculine like he works out.  He's taller than me, I am 5'9" and he was wearing a glasses the frames was red."  ECF No. 54-4 at 14 (emphasis added).  Since the photographs in the array did not depict the physical stature of the men, and because all of the photographs depicted men wearing glasses, V-1 could not have selected Eugene's photo on those bases.  His remarks instead suggest that he selected Eugene's photo precisely because it was the only one depicting a person with a bald head and a beard.  *Id.*

The Court acknowledges that, as the Government argues, certain aspects of the October 14, 2022, photo array were procedurally proper.  *See* ECF No. 66 at 6–7.  For example, the array was administered by a detective that was unfamiliar with this case.  The array was also prefaced with instructions, such as a disclaimer that the persons in the array may not have the exact same features as they did on the date of the alleged offense because features like facial or head hair can change.  Moreover, the photographs were shown to V-1 sequentially instead of at once.  While

these procedural aspects of the array reduce the likelihood that the array was unduly suggestive, they alone cannot make the array not unduly suggestive, especially where, as here, Eugene was the only individual with significant identifying features previously relayed by V-1. *See Maldonado-Rivera*, 922 F.2d at 974 (recognizing that, if there is nothing "inherently prejudicial" about the method of presentation of the photo array, the inquiry does not end there, but rather, continues to the "principal question" of whether the picture of the accused "so stood out" from all of the other photographs, particularly in light of the witness's previous description).

The Government's counterarguments are to no avail.  The Government relies on out-of-circuit precedent from the Seventh and Tenth Circuits, *see* ECF No. 66 at 8–9, but this precedent is not binding on this Court; rather, precedent within this Circuit controls this result.  For example, in *Raheem*, witnesses had given a description of a suspect wearing a black leather coat, and in the lineup in question, only the defendant appeared in a black leather coat.  *Raheem*, 257 F.3d at 136. The Court found the lineup unduly suggestive because the black leather coat was the "outstanding feature" of the suspect's appearance, "was an integral part of the description" provided to police, and was a "critical factor" in the witnesses' ultimate selection of the defendant from the lineup. *Id.* at 137.  So, too, here, the Suspect's bald head and beard were "outstanding feature[s]" and an "integral part" of V-1's descriptions of his assailant.  *Id.*  And here, as described above, these characteristics were "critical factor[s]" in V-1's selection of Eugene from the lineup.  *Id.*

*Maldonado-Rivera*, too, supports the Court's conclusion.  There, the witness had described the suspect as balding or losing some of his hair and having a small beard; the photo array, in turn, depicted nine individuals who each had a small amount of facial hair, two of whom were balding and two of whom had receding hairlines.  922 F.3d at 974.  But "there was no feature of [defendant's] photo that made his stand out from all the rest."  *Id.* at 975.  Here, by contrast,

14

Eugene markedly stands out from the other individuals as he is the only one depicted with the combination of a completely bald head and a full, thick beard. Because these key components of V-1's descriptions were featured in the photo of Eugene and not in the photos of others, the photo array was unduly suggestive.

Finally, the Government is correct in its assertion that not all individuals in a photo array have to be identical. *See Jarrett*, 802 F.2d at 41 ("It is not required, however, that all of the photographs in the array be uniform with respect to a given characteristic."). But even so, a photo array will be unduly suggestive if an individual exhibits key traits in a manner that is not reflected in other photos. *See United States v. Fernandez*, 456 F.2d 638, 641 (2d Cir. 1972) (reasoning that "[w]hile the Government cannot be expected to produce photographs of persons identical with the accused except in minor details," the lineup in that case was unduly suggestive because the array "contained no photograph remotely resembling [defendant] in skin color and hair-do"). And here, the Court concludes that, for the reasons stated above, Eugene's photograph "so stood out from all the other photographs," *Jarrett*, 802 F.2d at 41, such that the array was unduly suggestive.

### B. Independent Indicia of Reliability

As noted above, the Government has stated that, if the Court found that the photo array was unduly suggestive, it would not seek to offer the array at trial. But it nonetheless seeks to offer V-1's potential in-court identification of Eugene at trial. The Court must thus proceed to the next step of the analysis.

Having found the October 14, 2022, photo array unduly suggestive, the Court must now determine whether V-1's in-court identification would be independently reliable, because "[e]ven if an identification procedure is unduly suggestive," a later identification "may nonetheless be admissible if other factors indicate that the identification is independently reliable." *Brisco v.*

*Ercole*, 565 F.3d 80, 89 (2d Cir. 2009); *Young v. Conway*, 698 F.3d 69, 78 (2d Cir. 2012) ("[w]hether an in-court identification is nevertheless admissible depends on whether it has an origin independent of the tainted" pretrial identification procedure). "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).

Courts in this circuit have applied various factors in a totality-of-the-circumstances analysis to determine whether an in-court identification of a defendant has reliability independent of unduly suggestive procedures. First, courts have applied factors known as the *Biggers* factors, evaluating: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Raheem*, 257 F.3d at 135 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)).

Courts have also applied the *Wade* factors, evaluating: (1) the victim's opportunity to observe the alleged criminal act (the most important factor); (2) any discrepancy between any pre-trial identification description and the defendant's actual description; (3) any identification prior to the pre-trial identification procedure of another person; (4) a photographic identification of the defendant prior to the illegal pretrial identification procedure; (5) the victim's failure to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the pretrial identification. *Young*, 698 F.3d at 78 (identifying these factors as the *Wade* factors).

The parties generally agree that the Court should evaluate the *Biggers* factors and the *Wade* factors, given the totality of the circumstances inquiry. *See* ECF No. 136 at 4–5; Def.'s Suppl. Br.,

ECF No. 137 at 6–7.  Eugene highlights that there is substantial overlap between the two sets of factors, with several of the *Wade* factors being covered by the *Biggers* factors.  He specifically notes that the *Wade* factors add the analysis of the witness's prior identifications (or not) of the defendant.  *See* ECF No. 137 at 14 (citing the third, fourth, and fifth *Wade* factors discussed above).  The Court agrees with Eugene's framing of the relevant factors.  The Court will thus analyze the *Biggers* factors and then these three *Wade* factors.

When weighing these factors, the Court is mindful that "a good or poor rating with respect to any one of these factors will generally not be dispositive," and the question of independent reliability must be assessed in light of the totality of the circumstances.  *Raheem*, 257 F.3d at 135; *see also Biggers*, 409 U.S. at 199; *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977).  The Government bears the burden of establishing an identification's independent reliability by clear and convincing evidence.  *Young*, 698 F.3d at 78 (citing *Wade*, 388 U.S. at 240).

### 1. The Opportunity of the Witness to View the Criminal

V-1's opportunity to view the Suspect weighs in favor of the Government.

Importantly, V-1 had two opportunities to view the Suspect's face unblocked by a ski mask.  ECF No. 125 at 75.  The first opportunity occurred just after the Infiniti entered the parking lot.  The Suspect exited from the rear driver's side door of the Infiniti and approached V-1 with a firearm.  *Id.* at 30–32.  V-1 observed that the Suspect was in a full black hoodie, black ski mask, black gloves, and glasses.  *Id.* at 31.  He also testified that the Suspect had a full beard that was observable even though the Suspect was wearing a ski mask.  *See id.* at 32, 78.  While the Suspect was "right in front of [V-1]'s face," and approximately one foot away, V-1 engaged in a physical altercation in which he lifted the Suspect's mask, at which point V-1 could view the Suspect's face.  *Id.* at 32–33.

V-1 had a second opportunity to view the Suspect's face inside the Infiniti, while in close shoulder-to-shoulder proximity. *Id.* at 36. V-1 testified: "I pulled off his mask. His glasses fell off his face, so I could see his face fully." *Id.* at 41. V-1 added that "[h]e was a dark-skinned person. He had a thick beard, shine head, very masculine," *id.*, and that he could view the suspect from his ears down and that he "could see he didn't have no hair on his head at the moment," *id.* at 70. While V-1 never saw the top of the Suspect's head because the ski mask was never lifted fully off the top of the Suspect's head, V-1 testified, "I could see from the ski mask, the shape of [the top of the Suspect's head], I could see there wasn't no hair under it." *Id.* at 74.

While the time in which V-1 was able to observe the Suspect was marked by a fluid and dangerous course of events, V-1's opportunity to view the Suspect was otherwise one suggesting a later identification would be reliable, and would not be tainted by the unduly suggestive photo array. The entirety of the alleged events on September 26, 2022, occurred during daylight hours. *Id.* at 29. Once inside the Infiniti, after an initial period of approximately five minutes in which V-1 was held in a position with his head looking at the ground, V-1 testified that he was able to view the Suspect at various points during the approximately thirty to forty-five minutes he was in the car. *See id.* at 46, 50, 65–66; *see United States v. Wong*, 40 F.3d 1347, 1360 (2d Cir. 1994) (finding that a period of observation of two to three seconds was "sufficient for identification"). Indeed, this time in the Infiniti was sufficient enough for V-1 to notice details as specific as the brand of the Suspect's glasses. ECF No. 125 at 60. And while V-1 was bleeding on his head and felt blood was running in his eye, and while he at times used a t-shirt to help stop the bleeding, he testified that his vision was not obscured. *Id.* at 62, 68–69.

Accordingly, this, the "most important" factor, weighs in favor of the Government. *See Young*, 698 F.3d at 80.

### 2. The Witness's Degree of Attention

V-1 evinced a remarkable degree of attention to his surroundings, under the circumstances. From the beginning of the events at issue in this case, V-1 exhibited a high degree of situational awareness, noticing the slightest of details.  Right off the bat, V-1, for instance, noted the make and model of the Infiniti, its color, that it had bumper damage, and how its windows were tinted. ECF No. 125 at 39, 60; ECF No. 82-4 at 12:24, 12:42.  He also observed which doors two of his attackers exited from while in the restaurant's parking lot.

For the thirty to forty-five minutes in which V-1 was kept in the back seat of the Infiniti, he also observed a striking amount of detail.  *See* ECF No. 125 at 46.  He testified that he made a conscious effort to observe the car's occupants and whereabouts.  *Id.* at 36.  He observed when and where the suspect sitting in the front passenger seat exited the Infiniti and what he said as he left.  *Id.* at 38, 42.  He monitored the Infiniti's route, recalling specific streets and neighborhoods through which the car navigated.  *Id.* at 40.  V-1 listened carefully to the dialogue exchanged between the passengers, noting subtle details such as the fact that when the driver referred to someone as "Fresh," he was looking in the mirror at the Suspect.  *Id.* at 42–43.  V-1 also noted that he believed the Suspect may be the Infiniti's owner because he was talking about needing to take it to a shop to get it fixed.  *Id.* at 43.

Eugene asks the Court to discount its assessment of V-1's reliability because he was distracted by the suspects' firearms.  But the record indicates that, despite the presence of firearms, V-1 observed a great amount of detail.  *See Wong*, 40 F.3d at 1360 (noting that a high-stress situation can result in a higher degree of attention by an eyewitness).  It is true that Plaintiff observed that all the suspects were carrying a firearm, that Plaintiff admits he was somewhat distracted by the firearms, and that there were generally elements of exceptional stress, V-1's fear

for his life, and general distraction stemming from these events.  ECF No. 125 at 71, 75–76.  But these factors did not stop V-1 from observing the specific doors from which gun-carrying suspects exited, for example.  He also noted details of each of the four armed suspects, including the color of their clothing, their builds, and their heights.  ECF No. 54-3 at 7.  Indeed, he even had the attention to note the color and brand of the Suspect's glasses.  ECF No. 125 at 60.   Moreover, while V-1 was scared, he was not overly intimidated:  on two separate occasions, he had the courage to initiate a physical altercation with armed men to resist his abduction, and in the course of those interactions he twice pulled at the Suspect's mask in an attempt to see his face.  *Id.* at 33, 68, 79.

Accordingly, V-1's degree of attention weighs in favor of the Government.

### 3. The Accuracy of the Witness's Prior Description

The accuracy of V-1's prior descriptions of the Suspect also weighs in favor of the Government.  On the same day as his alleged kidnapping, V-1 described the left rear passenger as a Black Male, approximately 6'2" tall, having a muscular build, a black beard, and as wearing a black ski mask, black clothing, and see-through glasses.  ECF No 54-3 at 7.  On September 28, 2022, V-1 had identified the individual who sat in the left rear passenger seat has having a beard, a bald head, being muscular, over six feet tall, and having dark skin.  ECF No. 82-4 at 12:26.  In this way, V-1's prior descriptions are quite consistent with his *Wade* hearing testimony.  Indeed, Eugene does not point to a particular aspect of V-1's physical description of the Suspect that is *inconsistent* between the prior identifications and the *Wade* hearing testimony.

Eugene instead argues that *Raheem* and *Young* call for a different conclusion here, but this argument is misplaced.  Eugene admits that V-1 identified the Suspect as having a bald head, full beard, and muscular build, but argues that these are merely "general descriptions" of an individual,

and that the hair conditions may possibly change and, thus, are not permissible bases to rely on for identification purposes. ECF No. 137 at 11. In *Raheem*, the court did not view the two witnesses' prior descriptions of the suspect as indicia of reliability, in large part because they provided "virtually no detail" about the suspect's face. *Raheem*, 257 F.3d at 138. As for one witness, while he described that the suspect's face was round and without a mustache, he had been "unable to cite any other physical details." *Id.* The other witness testified that he did not notice anything distinctive about the suspect, except that "he was dressed very neat." *Id.* at 139. Here, by contrast, V-1 has provided descriptors beyond the Suspect's dress. Moreover, while one of the *Raheem* witnesses was unable to cite any physical details other than defendant's round face and lack of a mustache, here, V-1 affirmatively identified the Suspect as having a beard, and one thick enough to poke through a ski mask, ECF No. 125 at 78, as well as being bald, in addition to the other more general physical characteristics described.

Similarly, in *Young*, the district court weighed the prior description factor in favor of the accused because the witness "was essentially unable to give a pre-lineup description of the intruder," in part because she had not seen the full face of the suspect. *Young v. Conway*, 761 F. Supp. 2d 59, 75 (W.D.N.Y. 2011), *aff'd*, 698 F.3d 69 (2d Cir. 2012). While the witness observed the eyes, forehead, and eyebrows of the suspect, she admitted that she did not observe any "distinguishing characteristics" of the suspect's face. *Id.* The court was "dubious" of her later descriptions about the suspect's eyes in light of her admission that there was nothing even remotely remarkable about the intruder's face. *Id.* Here, however, V-1 had two opportunities to view the Suspect's face and he was able to give a description of the Suspect immediately after his kidnapping. Moreover, far from not observing anything remarkable, V-1 not only observed the

above-described features of the Suspect, but also told Police, "[i]If I see the guy, I could know him, because I was looking dead in his face." ECF No. 82-4 at 12:27.

### 4.  The Witness's Level of Certainty at the Confrontation

V-1 exhibited a high level of certainty at each juncture in this case, which makes this factor weigh in favor of the Government. As mentioned above, on September 28, 2022, V-1 confirmed he would be able to identify the Suspect if he saw him again. *Id.* Such a statement demonstrates V-1's confidence in his ability to identify the Suspect. Additionally, at that September 28, 2022, interview, V-1 was shown a photo array of eight individuals—which did not include a photograph of Eugene—and did not identify any of them as any of the suspects from the September 26, 2022, incident. September 28, 2022, Photo Array, ECF No. 82-3. That he did not identify any of these individuals further bolsters the level of certainty he exhibited.

At the October 14, 2022, photo array, V-1 only positively identified one photograph out of an array of eight. While V-1 did not give an explicit statement as to the degree of confidence, he wrote about the photograph of Eugene, "[t]his person has beard and bald head as 1 of the guys from the incident. He was very masculine like he works out. He's taller than me, I am 5'9" and he was wearing a glasses the frames was red." ECF No. 54-4 at 14. Then, at the *Wade* hearing, when asked about how he felt about his ability to identify the Suspect again, V-1 testified, "[i]f I see him, I could identify him, yes." ECF No. 125 at 81.

Eugene cites Fifth Circuit case law to cast doubt on the scientific correlation between witness certainty and the accuracy of identification, ECF No. 137 at 12, but the Court must follow the law of this circuit, which requires it to analyze the level of certainty demonstrated by the witness. V-1 expressed confidence in his identification. Additionally, while Eugene points to *Raheem* for support that, where an individual fails to describe the assailant's physical features, his

level of certainty cannot weigh in favor of reliability, the Court has noted above that V-1 *did* sufficiently identify features of the Suspect and that V-1 was confident in doing so.

### 5.  The Length of Time Between Crime and Confrontation

V-1 initially described the Suspect to police minutes after his release.  ECF No. 54-3.  He then gave a similar description of the suspects a mere two days afterwards and then identified Eugene in a photo array eighteen days after the alleged kidnapping.  Eugene argues that eighteen days is too long of a time gap to weigh in favor of reliability.  But the court in *Raheem* observed that a three-week gap between the crime and the identification there was not particularly long.  *See Raheem*, 257 F.3d at 139.  Additionally, in *Raheem*, the two witnesses had made incorrect identifications of a suspect less than one week after the incident at issue, *id.*; V-1 made no such incorrect identification here.  Eugene also overlooks that courts have found an identification reliable even when the period between the crime and the identification is much longer than eighteen days.  *See Biggers*, 409 U.S. at 201 (concluding that while the seven-month lapse between crime and confrontation would be a "seriously negative" factor in most cases, the victim's otherwise reliable testimony did not require suppression); *see also Wong*, 40 F.3d at 1360 (concluding that ten-month gap before lineup was outweighed by other factors).

### 6.  Remaining Wade Factors

Having analyzed the *Biggers* factors, as well as the *Wade* factors that generally overlap with the *Biggers* factors, the Court now analyzes whether V-1:  (i) made any identification prior to the pre-trial identification procedure of another person; (ii) made a photographic identification of the defendant prior to the illegal pretrial identification procedure; or (iii) failed to identify the defendant on a prior occasion.  While the first and final factors weigh in favor of the Government, the second weighs in favor of Eugene.

First, V-1 did not make any identification of any other person other than Defendant Eugene in the September 28, 2022, and October 14, 2022, photo arrays.[9]  *See* ECF Nos. 54-4, 82-3. Second, V-1 did not make a photographic identification of Eugene prior to the unduly suggestive lineup, which weighs in Eugene's favor.  Finally, V-1 has not failed to identify Eugene on a prior occasion, as the only photo array that V-1 participated in that featured a photo of Eugene was the photo array at which V-1 identified him.

### 7.  *In Sum*

In weighing all of the above factors, the Court finds that V-1's in-court identification would be sufficiently independent of any taint from the unduly suggestive October 14, 2022, photo array. Only one factor, whether V-1 made a photographic identification of the defendant prior to the illegal pretrial identification procedure, weighs in favor of Eugene.  The remaining factors weigh in favor of the Government and lead the Court to conclude that there is clear and convincing evidence that V-1's in-court identification would be independently reliable.  Accordingly, Defendant's motion to suppress V-1's potential in-court identification of Eugene is denied, and the Government is permitted to elicit an in-court identification from V-1 at trial, for the jury to consider.  Defendant is free to cross-examine V-1 about the events of September 26, 2022, and as to any in-court identification he may make.  *See Perry*, 565 U.S. at 232 (noting that if the identification evidence is admitted, "the jury will ultimately determine its worth").

---

[9] While the Government argues in its supplemental brief that V-1 did not identify any other suspect in a November 9, 2022, photo array, ECF No. 136 at 14, that reference is not accompanied by a citation to the record, and the parties did not otherwise provide documentation of that array for the Court's consideration.  Eugene has stated that he has not received discovery relating to the November 9, 2022, array; the Government claims no such discovery is available. *See* ECF No. 125 at 15–17.  In light of the lack of discovery on this issue, the Court does not consider the November 9, 2022, photo array.

## IV.    CONCLUSION

For the reasons described above, Defendant Eugene's motion to suppress is GRANTED as to the inadmissibility of the October 14, 2022, photo array at trial, but DENIED in all other respects, including as to his challenges to the search warrants and as to any potential in-court identification by V-1.


**SO ORDERED** at Hartford, Connecticut, this 10th day of April, 2025.


 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE